JON J. PAULSON and GLORIA PAULSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Paulson v. Commissioner
Docket No. 14941-89
United States Tax Court
T.C. Memo 1991-508; 1991 Tax Ct. Memo LEXIS 557; 62 T.C.M. (CCH) 968; T.C.M. (RIA) 91508; October 7, 1991, Filed *557 Decision will be entered under Rule 155. Jon J. and Gloria Paulson, pro se. John Schmittdiel, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for the years and in the amounts as follows: Additions to tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651(a)(1) [1]
6653(a)(1)
6653(a)(2)
6661
1984
$ 45,022
$ 11,284
$ 2,257 *
$ 11,284
1985
$ 19,400
-
$ 970 **
$ 4,850
Plus recapture of $ 113 earned income credit. The issues for decision are: (1) Whether the reported income of P-Quad Company Trust should be includable in petitioners' gross income because the *558 trust lacked economic substance and should be disregarded for income tax purposes or, alternatively, whether the trust income is taxable to petitioners as an anticipatory assignment of income; (2) Whether the income received by the trusts, if found to be trusts for tax purposes, is taxable to petitioners under the grantor trust provisions of sections 671-677; (3) Whether respondent's assessment against petitioners is barred by the statute of limitations; (4) Whether petitioners timely raised the issue of net operating loss (NOL) carryforwards from previous years and, if so, whether the existence and the amounts can be determined, and whether petitioners satisfied the requirements for carrying the losses forward; (5) Whether petitioners are liable for additions to tax for negligence under section 6653(a) for taxable years 1984 and 1985; (6) Whether petitioners are liable for the additions to tax under section 6661 for taxable years 1984 and 1985; and (7) Whether petitioners are liable for the addition to tax under section 6651(a)(1) for failing to timely file their 1984 income tax return. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and *559 accompanying exhibits are incorporated by this reference. Petitioners resided in Lake Benton, Minnesota, at the time they filed their petition herein. Beginning in 1975 and continuing through September 1983, Jon J. Paulson (hereinafter petitioner) practiced veterinary medicine in a partnership known as Western Veterinary Service. Petitioner's partners in Western Veterinary Service included three other veterinarians, Michael Dierenfeld, Lloyd Emond, and Loren Johnson. During 1983, petitioner and Lloyd Emond made a proposal to change the business form of the partnership to a business trust. Subsequently, James and Joan Noske met with the partners and presented a plan which included operating the veterinary practice in the form of a business trust. Joan Noske, a certified public accountant, explained the accounting system to be utilized in the trust structure. For the years in issue, Joan Noske prepared petitioners' individual income tax returns, and the fiduciary income tax returns for Western Veterinary Company (WVC) and P Quad Company (PQC), two business trusts involved in this case. On November 16, 1985, the United States District Court for the District of Minnesota entered *560 a Final Judgment of Permanent Injunction As To James L. and Joan M. Noske d.b.a. Zako, holding that James and Joan Noske had engaged in conduct subject to penalty under section 6700 of the Internal Revenue Code and enjoining them from organizing, assisting, selling, or otherwise promoting business trusts as abusive tax shelters. As part of that Judgment, James and Joan Noske were ordered to supply the District Director of the Internal Revenue Service with names and addresses of the purchasers of 186 business trusts on file with the Minnesota Secretary of State which listed a common corporate trustee. The business trusts involved in the instant case, WVC and PQC, were 2 of the 186 business trusts listed by James and Joan Noske and provided to the District Director of the Internal Revenue Service as required by the permanent injunction. Petitioners agreed to establish these business trusts after only a cursory investigation of the legal ramifications. Petitioner's investigation of the business trust form included discussions with James and Joan Noske and a telephone conversation with an attorney recommended by James Noske. The business trusts involved in this case are all similar *561 in structure and we will describe their formation and structure in the aggregate. The first step was to set up the trust. Parnell and Armageddon, both nonprofit corporations formed under the laws of South Dakota, would, as trustees, form a trust using an instrument referred to as a Declaration of Trust. The trust was to be an unincorporated common law trust or Massachusetts Trust. The trustees were to file the Declaration of Trust with the Minnesota Secretary of State under section 318.01 et seq. of the Minnesota Code. The beneficial interests in the trust were to be evidenced by trust certificates. The certificates would enable the holder to participate proportionately in all dividends and other distributions of income or principal from the trust at the discretion of the trustees. Upon the termination of the trust, the trustees were to distribute all property, income, and accrued interest in the trust to the certificate holders. During the life of the trust, the certificate holders had no right to trust property, only to their proportionate share of dividends and distributions as actually paid out. The business and property of the trust were to be managed by the board of *562 trustees, who were the persons named in the Declaration of Trust (Parnell and Armageddon). The trustees were to hold the trust property in the trust name and were to have absolute and exclusive power and control over the management and conduct of the business free from any right of control of any of the certificate holders. The trustees were to maintain books, accounts, and records, preserve accurate minutes of all meetings, and record all decisions pertaining to the trust. The trust was to remain in existence for 25 years. The trustees, Parnell and Armageddon, created three Declarations of Trust for petitioners and filed them with the Minnesota Secretary of State. The first trust, PQC, was created on April 25, 1983, and filed with the Secretary of State on August 2, 1983. The second, WVC, was created on April 25, 1983, and filed with the Secretary of State on August 25, 1983. The third trust, Jefferson Company, was created on April 25, 1983, and filed with the Secretary of State on August 25, 1983. All three Declarations of Trust were signed by two trustees: Cheryl A. Foshaug as president of Armageddon and Marti Inman as president of Parnell. Foshaug's signature also appears *563 on various minutes and contracts for the three business trusts. James Noske asked Foshaug to become president of Armageddon. As president of Armageddon, Foshaug performed no management or trustee duties for the three trusts except the signing of various papers, including blank or incomplete pages. Foshaug never held any meetings, negotiated any matters, or discussed Armageddon's business with its board of directors. Foshaug never heard of PQC, WVC, or Jefferson Company or took any action on their behalf. As president of Parnell, Marti Inman signed various papers at the request of James Noske. The papers signed by Inman were incomplete with many blank spaces. Inman did not read the documents prior to signing them. She performed no other management or trustee duties for Parnell. Inman never heard of WVC or PQC before the trial of this case and never acted on behalf of either of these trusts. On June 14, 1985, the United States District Court for the District of Minnesota entered a Final Judgment of Permanent Injunction as to Cheri Moorhouse, Cheryl Foshaug, Marti Inman, Armageddon, and Parnell, enjoining them under sections 7408 and 7402 from "organizing or assisting in the *564 organization of an abusive tax shelter plan or arrangement involving business trusts, and from engaging in any other similar conduct which interferes with the proper enforcement of the Internal Revenue laws of the United States." On September 1, 1983, the partners of Western Veterinary Service purported to transfer the assets of the partnership to WVC in exchange for 100 shares of the beneficial interest in the trust. Petitioner received 25 shares of the beneficial interest in WVC. The Minutes of the Trustees of WVC which authorized this action were signed by Foshaug and Inman as presidents of Armageddon and Parnell, respectively. The Schedule K-1 attached to WVC's U.S. Fiduciary Income Tax Return for the fiscal year beginning November 1, 1983, and ending October 30, 1984, lists PQC, and not petitioner, as holding a beneficial interest in WVC. This is so even though no minutes or transfer documents exist which indicate that petitioner actually transferred the 25 WVC shares to PQC. On September 1, 1983, petitioners purported to transfer various cattle and equipment to PQC in exchange for 100 shares of the beneficial interest in PQC. The minutes of PQC approving this action bear *565 the signatures of Cheryl A. Foshaug and Marti Inman as presidents of Armageddon and Parnell, respectively, and trustees for PQC. A document entitled "Call and Waiver of Meeting of Trustees of P Quad Company" stated that Foshaug and Inman called a meeting on November 1, 1983, to appoint a managing director for PQC. The minutes for this purported meeting appointed Daniel Strohmeier as managing director of the PQC trust. A document entitled "Minutes of Special Meeting of P Quad Company" stated that a meeting was called on November 2, 1983, at which Foshaug and Inman approved a transaction involving the surrender of petitioners' PQC shares and a reissuance of PQC shares to petitioners and BBCA, Inc. The trustees purported to meet and approve petitioners' surrender of 100 PQC shares and a subsequent reissuance of 20 shares to petitioner, 20 shares to Gloria J. Paulson, and 60 shares to BBCA, Inc. Joan Noske was the president of BBCA, Inc., during the years in issue. During the years in issue, petitioner purportedly had an agreement to act as an independent contractor for PQC and provide veterinary services to WVC. WVC paid PQC $ 2,500 a month, $ 30,000 annually, to provide general *566 veterinary services to WVC. Petitioner was PQC's only provider of the veterinary services for which it received income. Petitioner worked full time as a veterinarian with WVC pursuant to the purported independent contractor arrangement with PQC but did not report any income from PQC for the services he rendered to WVC for taxable years 1984 and 1985. The only income petitioners reported from PQC on their individual income tax return was their 40-percent share of the income distribution. Petitioners' 40-percent share of PQC's income distribution was approximately $ 8,136 for taxable year 1984 and $ 11,382 for taxable year 1985. In addition to the $ 30,000 PQC reported as income from the veterinary services provided by petitioner, PQC reported income from WVC in the amount of $ 9,666 and $ 11,912 for taxable years ending October 31, 1984 and 1985, respectively. These amounts represented reimbursement for petitioner's automobile expenses. PQC also reported income on Form 1041, Schedule E, from distributions made by WVC. The distribution amounts for taxable years ending October 31, 1984 and 1985, were $ 12,907 and $ 15,150, respectively. In November 1984, cattle previously transferred *567 by petitioners to PQC was sold. The purchaser paid $ 59,770 for the cattle in 1984, and the remaining balance of $ 7,525 in 1985. The expenses of the sale were $ 17,901. The net proceeds of the cattle sale received in 1984, $ 41,869 ($ 59,770 less $ 17,901), were applied to petitioner's loan account at Production Credit Association in Marshall, Minnesota. During the years in issue, the trustee activity for PQC and WVC was minimal at best. Betty Hanson (Hanson) was the managing director of WVC. As managing director, Hanson never discussed business matters with any of the trustees for WVC or PQC. Hanson was responsible for writing the checks to PQC for the services petitioner supplied to WVC. Hanson did not remember giving the checks to any trustee of PQC or to the PQC's managing director, Daniel Strohmeier. She also could not recall whether or not she gave the checks directly to petitioner. Daniel Strohmeier, the managing director for PQC during the years in issue, did not testify. Dr. Michael Dierenfeld, a partner in Western Veterinary Service, and later a 25-percent beneficial owner in WVC, never talked or met with any of the trustees of WVC. In early 1984, Dr. Dierenfeld *568 decided to leave the WVC veterinary practice. Dr. Dierenfeld negotiated the buyout of his WVC interest with petitioner, Dr. Lloyd Emond, and Dr. Loren Johnson. Dr. Dierenfeld never discussed the buyout of his beneficial interest with any of the WVC trustees. During taxable years 1984 and 1985, petitioners paid or incurred various expenses related to the veterinary practice and cattle activity. In March 1983, petitioner purchased a 1983 Chevrolet pickup for $ 12,628. In November 1984, petitioner traded in the 1983 Chevrolet pickup and purchased a 1985 Ford pickup for $ 17,685. During 1984 and 1985, PQC paid the monthly payments under the installment contract for petitioner's 1983 and 1985 pickup trucks. The interest expense on the pickup truck financing was $ 882 in 1984 and $ 1,842 in 1985. The depreciation expense on the pickup trucks was $ 3,251 in 1984, and $ 6,503 in 1985. In 1983, petitioner purchased a veterinarian equipment box for his pickup truck. Petitioner's interest expense from the installment purchase of the equipment box was $ 780 each year. The depreciation expense for the equipment box was $ 1,099 in 1984, and $ 1,049 in 1985. The feed expense for the *569 cattle activity was $ 1,725 in 1984. Petitioner paid a $ 20 veterinarian license fee in 1985. Petitioners had investment credit recapture of $ 333 on the disposition of the 1983 Chevrolet pickup in 1984 and an investment credit of $ 742 from the purchase of the 1985 Ford pickup in 1984. During 1984, petitioners paid interest of $ 5,795 on two mortgage loans outstanding at First Minnesota Savings Bank. In 1985, petitioners paid interest of $ 6,036 to First Minnesota Savings Bank. Petitioners' Federal income tax return for 1984 reported the following: Wages
$ 1,138
Capital Gain
$ 626
Income from PQC
$ 6,570
Adjusted Gross Income
$ 8,334
Allowable Contributions
$ 62
Personal and Dependency Exemptions
$ 5,000
Taxable Income
$ 3,272
Tax Liability
$ -0-
Petitioners' 1985 Federal income tax return reported the following: Wages
$ 1,350
Capital Gain
$ 437
Income from PQC
$ 10,292
Adjusted Gross Income
$ 12,079
Allowable Contributions
$ 40
Personal and Dependency Exemptions
$ 6,240
Taxable Income
$ 5,799
Tax Liability
$ -0-
Petitioners filed their 1984 income tax return on April 17, 1986. Petitioners timely filed their 1985 income tax return. Respondent *570 mailed the statutory notice of deficiency for taxable years 1984 and 1985 on April 11, 1989. At trial, petitioners made an oral motion to amend the pleadings to include a claim for a net operating loss carryforward. Petitioners contend that they had net operating losses from 1981 and 1982 that could be carried forward to offset their 1984 and 1985 taxable income. The evidence of net operating losses for 1981 and 1982 presented by petitioners consisted of unfiled, unsigned Federal income tax returns that were apparently completed in settlement negotiations between the Internal Revenue Service and petitioners in a separately docketed case. Petitioners' claim of net operating loss carryforwards was not included in the petition, pretrial motions, or trial memorandum. Respondent was not made aware of the claim until the eve of the trial. OPINION Respondent determined that the income reported by the PQC trust should be includable in petitioners' gross income because the trust lacked economic substance and should be disregarded for Federal income tax purposes. Respondent contends that petitioners continued to control and enjoy the income generated by the veterinary practice and the *571 cattle business, and that petitioners and PQC were indistinguishable for Federal income tax purposes. Respondent also argues that the trust income is taxable to petitioner as an anticipatory assignment of income. Alternatively, respondent contends that PQC is subject to the grantor trust provisions of sections 671-677. Petitioners argue that PQC is a legitimately established business trust, with corporate trustees, that has economic substance separate and distinct from petitioners sufficient to treat PQC as a separate taxable entity. The facts establish otherwise. It is well established that the true substance of a transaction, rather than its form, controls the tax consequences. Gregory v. Helvering, 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935). This Court has consistently held that when the form of a transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax according to the substance of the transaction. Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980); Furman v. Commissioner, 45 T.C. 360, 364 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). While *572 it is settled law that a taxpayer may reduce his taxes by any means the law allows, Gregory v. Helvering, supra at 469, that right does not allow the taxpayer to construct paper entities to avoid taxation when those entities are without economic substance. Zmuda v. Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). This rule applies even if the entity has a separate existence recognized under State law. Zmuda v. Commissioner, supra at 720, citing Furman v. Commissioner, supra.
Whether the PQC trust lacks economic substance and is therefore a sham is a factual question to be decided on the basis of the facts before the Court. United States v. Cumberland Public Service Co., 338 U.S. 451, 94 L. Ed. 251, 70 S. Ct. 280 (1950). In the instant case, the facts indicate that the business trusts were mere paper entities. The veterinary practice and cattle operation were operated in a similar manner both before and after they were transferred to the PQC trust. The trustees, Cheryl A. Foshaug and Marti Inman, never heard of PQC or WVC and did not fulfill any trustee *573 responsibilities with respect to either of the trusts. They did not attend any meetings, perform any managerial tasks, or advise the managing directors on any business matters. They merely signed documents, often incomplete documents, without reading or reviewing the documents. Foshaug and Inman were the trustees who signed the Declaration of Trust for PQC and the minutes for PQC, and acted to appoint Daniel Strohmeier as managing director for PQC. Yet Foshaug and Inman had never heard of PQC or Daniel Strohmeier. Betty Hanson was allegedly appointed managing director for WVC. However, she never discussed any business matters with the trustees of WVC or PQC. As managing director for WVC, she was responsible for writing and issuing the checks in payment of the veterinary service provided by petitioner in accordance with the purported agreement between WVC and PQC. Hanson testified that she did not remember issuing checks to the PQC managing director, Daniel Strohmeier, or to any PQC trustees. Hanson also testified that she could not recall whether or not she paid petitioner directly for the veterinarian services. The lack of trustee control and involvement was also clearly *574 evidenced during Dr. Dierenfeld's negotiations to sell his beneficial interest in WVC. Dr. Dierenfeld negotiated directly with petitioner and the remaining beneficial owners of WVC, and did not negotiate the buyout with any of the trustees or Hanson as managing director. This is the case even though Article III of WVC's Declaration of Trust requires unanimous approval by the board of trustees prior to any sale of trust certificates. Article IV of the Declaration of Trust for PQC states that the business and property of the trust were to be managed by the board of trustees, who were the persons named in the Declaration of Trust. The facts establish that there was little or no managerial input from the named trustees or the managing director for PQC. We agree with respondent that petitioner and PQC were indistinguishable. Petitioner claimed to have an independent contract with PQC to provide veterinarian services to WVC, yet petitioner did not report any compensation from PQC for these full-time services. Moreover, after the cattle was purportedly transferred to PQC and subsequently sold, the net proceeds of the sale were applied to petitioner's loan account at Production Credit *575 Association. Despite the fact that these transactions occurred, petitioners only reported 40 percent of the PQC income distribution on their tax returns for 1984 and 1985 based on their 40-percent beneficial interest. Consequently, for the foregoing reasons, we find that the PQC business trust was a mere paper entity wholly without economic substance and will not be respected for tax purposes. Accordingly, the income reported by PQC is includable in petitioners' income. Because we hold that the PQC trust is to be disregarded for tax purposes, it is unnecessary for us to address whether an anticipatory assignment of income occurred, or whether the grantor trust provisions of sections 671-677 apply in the instant case. In his determination, respondent disallowed certain expenses claimed by PQC for lack of substantiation. In respondent's findings of fact, he allowed additional deductions not allowed previously in the deficiency notice. Petitioners bear the burden of proving their entitlement to any claimed deductions. Rule 142(a). Petitioners have failed to substantiate the expenses claimed except those allowed in respondent's findings of fact. Accordingly, we hold that the *576 claimed expenses are disallowed except those expenses allowed by respondent in his determination as modified by his findings of fact in the opening brief. Petitioners contend that respondent's assessments against petitioners for 1984 and 1985 are barred by the statute of limitations. Petitioners filed their 1984 Federal income tax return on April 17, 1986. Petitioners timely filed their 1985 Federal income tax return. Respondent mailed the deficiency notice for both taxable years on April 11, 1989. Section 6501(a) provides that the amount of any tax imposed by this title must be assessed within 3 years after the return is filed. If a return is filed before the last day prescribed by law, the return is deemed filed on the last day. Sec. 6501(b)(1). In the instant case, the last day prescribed by law is April 15. The facts indicate that respondent timely mailed the deficiency notice with respect to taxable years 1984 and 1985. For taxable year 1984, the deficiency notice had to be mailed by April 17, 1989. For taxable year 1985, the deficiency notice had to be mailed by April 15, 1989. Respondent mailed the deficiency notice on April 11, 1989, and therefore mailed the notice *577 on a timely basis. Petitioners next argue that PQC's income cannot be attributed to petitioners because the time period for assessment against PQC has expired. In support of this position, petitioner cites Fendell v. Commissioner, 906 F.2d 362 (8th Cir. 1990), revg. 92 T.C. 708 (1989). In Fendell, the taxpayer was a beneficiary of a trust. Respondent issued a deficiency notice to the Fendells based on the disallowance of losses claimed by the trust that had been passed through to the taxpayers. The Fendells petitioned this Court, contending that the expiration of the statute of limitations on the trust's returns barred any adjustment of the amount of distributions from the trust claimed on their individual returns. We sustained the deficiencies and were reversed by the Eighth Circuit Court of Appeals. Petitioners' reliance on Fendell is misplaced. In Fendell, the trust was a separate viable entity recognized for tax purposes. The court in Fendell noted that the Fendells and the trust were separate taxpayers. Fendell v. Commissioner, supra at 363. The Eighth Circuit cited supporting cases and stated *578 that the "cases embody the principle that in order for the Commissioner to adjust tax liability, he must be able to do so at the source of the income, here the Trust, or will be prevented from doing so at the point where the income is distributed." (Emphasis supplied.) Fendell v. Commissioner, supra at 364. In the instant case, the facts establish that, for tax purposes, petitioners and PQC are inseparable. PQC lacked economic substance and is to be ignored for tax purposes. Therefore, the statute of limitations cannot expire with respect to a trust that is a sham for Federal tax purposes. Moreover, the Fendell holding focuses on the source of the income. In the instant case, petitioner was the source of the income. The holding in Fendell applies where the trust is recognized as separate taxable entity and respondent is attempting to adjust the income tax liability of the beneficiaries by increasing the trust's income and, hence, the beneficiary distributions. In the instant case, we hold that the trust is not a separate taxable entity and that petitioner is the source of the income. Therefore, the Fendell facts and holding are inapplicable *579 and respondent is not barred from assessing a tax against petitioners. At trial petitioners argued for the first time that a net operating loss carryforward was available that could offset income earned in the taxable years 1984 and 1985. Petitioners orally moved to amend the pleadings to include the claim for a net operating loss carryforward. Rule 41(a) allows a party to amend a pleading once at any time before a responsive pleading is served. If a pleading is one to which no responsive pleading is permitted and the case has not been placed on a trial calendar, then a party can amend the pleading within 30 days after it is served. Otherwise, a party may amend only by written consent of the adverse party or by leave of Court, and leave will be given freely when justice so requires. Rule 41(b)(2) states that where an adverse party objects to evidence not within the issues raised by the pleadings, the Court may receive the evidence and allow the pleadings to be conformed to the evidence if justice so requires and the objecting party fails to satisfy the Court that admitting the evidence would prejudice such party in maintaining his position on the merits. Petitioners never requested *580 leave of this Court to amend their petition and did not raise this new issue until the first day of trial. Petitioners' trial memorandum dated June 5, 1990, does not mention petitioners' claim of net operating loss carryforwards. The purpose of the pleadings is to give the parties and the Court fair notice of the matters in controversy and the basis of their respective positions. Rule 31(a). Respondent objects to petitioners' attempt to raise new issues on the day of trial and we believe respondent's objections to be well taken. Moreover, in petitioners' opening brief, it is noted that petitioners were aware of the net operating loss carryforwards at the time they filed their petition, approximately 12 months before the date of the trial. Petitioners have offered no satisfactory explanation for delaying until the eve of the trial to bring the issue to respondent's attention and failing to plead the issue until the first day of trial. To determine the amount and the availability of a net operating loss carryforward is a factual issue which would require consideration of taxable years 1981, 1982, and 1983. It would also require a review of potential net operating loss carryback *581 years to determine whether losses could have been carried back and whether a section 172(b) election was made to relinquish the entire carryback period. The evidence presented by petitioners consisted of unsigned tax returns that may or may not have been agreed to by the Internal Revenue Service during settlement negotiations in a separately docketed case. By raising the new issue at the date set for trial, petitioners have denied respondent an opportunity to verify or controvert the accuracy of the scant evidence submitted. Given the late date at which petitioners raised the issue respondent was wholly unprepared to respond. The timely raising of factual issues is particularly important to allow the other party equal opportunity to develop the facts before trial. Estate of Mandels v. Commissioner, 64 T.C. 61, 73 (1975); Junio v. Commissioner, T.C. Memo 1988-345. We hold that allowing petitioners to raise the issue of net operating loss carryforwards would substantially prejudice respondent and therefore we refuse to consider this new issue. Furthermore, the scanty evidence presented by petitioners at trial on this issue is insufficient *582 to carry their burden of proof in this case even had the raising of this new issue been permitted. The next issue presented for decision is whether petitioners are liable for additions to tax for negligence under section 6653(a). Negligence, for purposes of section 6653(a), may be defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934 (1985). Petitioners agreed to establish the business trusts after only a cursory investigation of the legal consequences. Petitioner's investigation was limited to discussions with James and Joan Noske, and a telephone conversation with an attorney recommended by James Noske. While at first blush it may appear that petitioner was a victim of bad advice, a closer inspection reveals that he had to have known that these were not legitimate transactions. The Declarations of Trust vested the management of petitioners' businesses in the trustees. Yet the trustees took no part in managing, controlling, or operating the businesses. Similarly, the managing director of PQC, Daniel Strohmeier, performed no managerial tasks. *583 Furthermore, petitioner did not know how much compensation he received for PQC under their alleged independent contractor arrangement and did not report any income for the providing of the veterinarian services for WVC. We find that petitioners were negligent and failed to use reasonable care in ascertaining their income tax liabilities in 1984 and 1985, and therefore petitioners are liable for additions to tax under section 6653(a). The next issue for our consideration is whether petitioners are liable for additions to tax under section 6661. Section 6661 imposes an addition to tax equal to 25 percent of an underpayment attributable to an understatement that exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). Section 6661(b)(2) provides an exception in cases where the taxpayer had substantial authority for the position taken on the return or adequately disclosed the relevant facts affecting the item's tax treatment. In the instant case, petitioners' only argument is that because there is no underpayment of tax there is no amount upon which to compute an addition to tax. There is no substantial authority for the position *584 taken by petitioners on their 1984 and 1985 Federal income tax returns, nor is there adequate disclosure of relevant items which would satisfy the requirements of section 1.6661-4, Income Tax Regs. Therefore, if a section 6661 understatement exists after petitioners' tax liability is recomputed under Rule 155 in accordance with this holding, petitioners are liable for the section 6661(a) addition to tax. The next and last issue presented for decision is whether petitioners are liable for an addition to tax under section 6651(a) for failing to file a return on the date prescribed by law. Petitioners filed their 1984 income tax return on April 17, 1986. Therefore, petitioners are liable for the section 6651(a)(1) addition to tax "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Sec. 6651(a)(1). Petitioners bear the burden of proving that their income tax return was timely filed or that such failure was due to reasonable cause and not due to willful neglect. Rule 142(a); Blackman v. Commissioner, 88 T.C. 677, 683 (1987), affd. without opinion 867 F.2d 605 (1st Cir. 1988). The envelope in which *585 the return was sent bears a postmark of April 17, 1986. Petitioners' 1984 income tax return bears a date received stamp of April 21, 1986. There is no evidence in the record that petitioners were granted an extension of time to file. There is no reasonable explanation for petitioners' failure to file their 1984 income tax return on a timely basis. Therefore, we hold that petitioners are liable for the addition to tax under section 6651(a)(1). Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * 50% of the interest due on $ 43,135. ** 50% of the interest due on $ 19,400.↩