T.C. Memo. 2012-351

UNITED STATES TAX COURT

PAULA J. HALATA, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6105-10.                    Filed December 19, 2012.

Jack W. Naranjo, for petitioner.

David B. Mora, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  The respondent (the "IRS") issued to petitioner Paula

J. Halata a statutory notice of deficiency pursuant to section 6212[1] showing the

_____

[1]All references to sections are to sections of the Internal Revenue Code.

**[\*2]** IRS's determinations of the following income-tax deficiencies, additions to tax, and penalty:

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Addition to tax sec. 6651(a)(2) | Penalty sec. 6662(a) |
|------|-----------|--------------------------------|--------------------------------|----------------------|
| 2007 | $6,787.45 | $530.10 | --- | $1,357.49 |
| 2008 | 27,695.00 | --- | ($^1$) | --- |

$^1$To be computed at a later date.

Various provisions in the stipulation resolve all the noncomputational issues in the case except for: (1) whether Halata is entitled to a $181,104 theft-loss deduction, (2) the year of the theft-loss deduction, and (3) the effect of the theft-loss deduction, through the operation of net-operating-loss carrybacks, on Halata's tax liabilities for the years at issue. The theft-loss deduction Halata claimed relates to $181,104 she transferred to a Swiss bank account on November 21, 2006. She contends that this money was lost to a scam. We determine that Halata is entitled to a theft-loss deduction. See infra part 2.a. However, the year of Halata's theft-loss deduction is 2009. See infra part 2.b. Furthermore, Halata did not plead her theory that the theft loss resulted in a net-operating loss for 2009 and that this net-operating loss should be carried back to 2007 or 2008. See infra part 3. She

**[*3]** cannot assert the theory now. Therefore the theft-loss deduction does not affect Halata's taxable income for 2007 or 2008 or her tax liabilities for these years.

## FINDINGS OF FACT

Halata resided in Texas when she filed her petition. During the period relevant to this case, Halata worked as a chemical-plant operator for ExxonMobil.[2] She also owned rental houses.[3] She is a high-school graduate with two years of college coursework.

In 1999 or 2000, Halata began a romantic relationship with Dominique Ojeda. In late 2000, Ojeda and her eight-year-old daughter moved in with Halata. Two years later, Ojeda lost her job as an optometrist's assistant. Halata began paying all the living expenses of Ojeda and her daughter. At some point, Ojeda worked as an apartment locator over the internet, but this work apparently did not provide much income. Ojeda also began researching other business opportunities on the internet.

---

[2]The parties stipulated some of the facts. The stipulation is incorporated by this reference.

[3]By 2006, she owned four rental houses.

**[*4]** In September or October 2006, Ojeda told Halata that she had learned of a way of making money through bank-guaranty transactions. Ojeda found this supposed opportunity through a member of the California bar named Dwight Montgomery. Montgomery persuaded Ojeda to participate in a bank-guaranty transaction. Because Ojeda did not have any money, Halata supplied the money for the purported transaction. Halata was given to understand that if she made a payment of about $180,000, Ojeda would receive $2.5 million; that the first installment of the $2.5 million would be paid to Ojeda two weeks after the payment of the $180,000; and that the $180,000 would be returned at any time upon request. Halata and Ojeda agreed that Halata would take the risk of loss on the purported transaction. Halata never personally spoke with Montgomery about the purported bank-guaranty transaction.

The trial record contains some documents, including emails, regarding the purported bank-guaranty transaction. These documents are quoted extensively in the discussion that follows. Many of the events, terms, persons, and entities referred to in the documents are not explained by the trial record.

Montgomery gave Ojeda an invoice from "European Investors Inc." dated October 13, 2006. Ojeda gave the invoice to Halata. The invoice requested that "Mantara Holding" pay 250,000 euro to account No. 0456-981457-12 at Credit

**[\*5]** Suisse in Lugano, Switzerland, a bank account supposedly owned by

"European Investors Inc.":

To:

MANTARA HOLDING
(HIS ADDRESS)[4]

DATE: 13TH OCTOBER 2006
PRO FORMA INVOICE N. 066/2006
Transaction code 032006WTDM

We, European Investors Inc., hereby present our corporate invoice as set forth in the Agreement dated 9th October 2006, by his [sic] reference the terms of which are incorporated herein, it was agreed that the 1st Party will cover the clearing, settlement and banking expenses against this invoice. This amount will be refunded by the 2nd Party at the end of the transaction, or can be deducted by the 1st Party form [sic] the amount of the payment fir [sic] the first tranche of Bank Guarantys as delivered by the 2nd Party to the 1st Party. If, in the event the Pre-Advice (MT799) is not delivered as provided in the Agreement, then the Eur 250,000 remitted by the 1st Party will be refunded by the 2nd Party to the 1st Party within ten (10) international banking days to the 1st Party's banking coordinates provided in the agreement.

TOTAL AMOUNT TO PAY EUR 250,000.00

_____

---

[4]The phrase "(HIS ADDRESS)" is in the original.

[*6]    Please pay to this designated bank account

Bank name:  CREDIT SUISSE
Address:  LUGANO, SUISSE
Swift Code:  CRESCHZZ69N
Account Number:  0456-981457-12
Account Holder:  EUROPEAN INVESTORS INC.

The invoice bears the following official-looking stamp:

European Investors Incorporated

International Business Company Act

1996

Domenica

Sometime before November 14, 2006, Montgomery emailed Ojeda:

Dear Dominique,

Thank you for your email and your message.  All you need to send is 140,000 euros which is approximately $180,000.  I have arranged for the payment of the additional 110,000 euros from a second party.

Last night (and early early morning) I contacted and spoke with all of the other parties except for the provider.  The buyer is online and ready to proceed.  The settlement bank (Dresdner Bank in Frankfurt Germany) is also online and ready to proceed.

I have not been able to contact the provider.  Once I get confirmation that the provider is online and ready to proceed, I will then call you (and the other person) to proceed.  I want to make certain that the Credit Suisse account in Lugano is still where the provider wants the 250,000 euros to be sent.  I also want to confirm that ABN AMRO is ready to cut the BGs for the transaction.

[*7] I do not want you or the other person to send ANY money until all has been confirmed.  It has taken time so we want to make certain that everyone is back online to proceed and get this deal finally done.

On a final note, I appreciate and thank you for your hard work and confidence -- you and Willie will be vindicated on this deal.  This deal will springboard us to other deals and allow us to do our own trading without the naysayers.

Shoot me a quick email if there are any changes, and I will call you as soon as I get confirmation from the provider.

Best regards,

Dwight.

On November 14, 2006, Montgomery emailed Ojeda:

Dear Dominique ... great news ... the provider is online and ready to proceed ... I have already talked with the other person regarding sending the 110,000 euros ... I will try to call you either later tonight or in the morning ... I will be busy this evening on other matters until 11 pm ... that will probably be way too late for you ... I expect that we will wire the 140,000 euros tomorrow ... please let me know whether that will be possible ... thanks ... Dwight.

Sometime between November 14 and 21, 2006, Ojeda emailed Montgomery

with the query:  "Any news on the BG?"

On November 21, 2006, Montgomery responded by email:

Dear Dominique,

We are ready to proceed.  I have the documentation signed by Pacific for Dr. Khoo who will send the 110K euros.

[*8] ALL YOU NEED TO SEND IS THE 140K EUROS (WHICH IS APPROXIMATELY $180K)

PLEASE EMAIL OR FAX (909-363-8351) A COPY OF THE PROOF OF REMITTANCE SO THAT I CAN SEND TO DR. KHOO -- I WILL ALSO SEND YOU A COPY OF HIS PROOF OF REMITTANCE (REMEMBER THAT HE IS IN SINGAPORE AND THE BANKS WON'T OPEN UNTIL 4 OR 5 PM CALIFORNIA TIME)

I HAVE ALSO ATTACHED ANOTHER COPY OF THE INVOICE WITH THE BANKING

I WILL CALL YOU ...

ALSO, I REVISED YOUR IMPI WITH THE BANKING AND ALREADY SENT TO DRESDNER TO SIGN ... SHOULD GET THAT BACK TODAY TOO ...

THANKS !!!

Dwight.

The email listed as an attachment a document titled "wtdm 250K invoice.wpd". No attachment was introduced into evidence.

On the same day, November 21, 2006, Halata signed documents authorizing her bank, Washington Mutual, to wire $181,104 to Credit Suisse. The documents stated that the "Beneficiary Name:" was "European Investors Inc.", that the "Beneficiary account number:" was 0456-981457-12, and that "Other Beneficiary Information:" was "TRANSACTION CODE 032006WTDM DOMINIQUE

**[*9]** OJEDA". On the same day, Washington Mutual confirmed that the wire transfer had been made. Halata was never given any account statement showing that the transferred money was being held in an overseas account for her.

Montgomery sent Ojeda the first page of a seven-page document entitled "IRREVOCABLE MASTER PAYMENT INSTRUCTIONS", which had an "Effective Date" of December 5, 2006. This page purported to relate to an obligation by Pacific Union Investment Corp. to provide an

> indemnity guarantee with full responsibility and authority under penalty of perjury to provide indemnity to pay protection to the respective payees set forth on the signature pages ("Payee") that percentage set forth for such payee on such signature page of the face value of each tranche, payable to Payee within eight (8) to twenty-four (24) international banking hours after receipt of the funds confirmed by the conditional SWIFT MT103 for each tranche pursuant to the Agreement.

The "Agreement" was defined as a "certain Agreement" with "Transaction Code" 032006WTDM. The document stated that the "Contract Amount" was 5 billion euro and that the "Transaction" was the "Purchase of Fresh Cut-Slightly Seasoned Bank Guarantee(s)". Even though the document described above has an "Effective Date" of December 5, 2006, it was given to Halata before the November 21, 2006 wire transfer.

[*10] Two weeks after the wire transfer, Halata had not received any money from the purported bank-guaranty transaction. Ojeda contacted Montgomery. Ojeda told Halata that Montgomery had given her some flimsy excuses for why there was no payment.

On July 24, 2007, Montgomery sent an email to Ojeda with a copy to someone named "Willie". Ojeda showed the email to Halata. The email stated:

> Dominique and Willie,
>
> As you know, Tommasi was a "no-show" ... person we met "stated" that he has seen him, but did not know where he was when we were there ... they are having a "runner" look out for him ...
>
> As for Thomas ... he and I talked yesterday and we may get the signed contract this week ...
>
> As for Maria ... her buyers are still looking at the contracts (i.e., trying to put the funding in place ...
>
> Working on two other buyers on the "collateral first" procedures ... should hear from them this week ...
>
> Also working on another avenue to get your 140K ... will know later this week ...
>
> Regards
>
> Dwight.

**[*11]** On August 11, 2007, Ojeda emailed Montgomery: "Once again Dwight, I have called left you messages and sent email asking you what is goin [sic] on and not had any response?"

On August 13, 2007, Montgomery emailed Ojeda:

Dear Dominique ... have been working 24/7 for past week on the buyers for Thomas and Bob ... procedures have been agreed to and am awaiting signed contracts to forward to provider ... these are the paper first deals and the stickiest issue was verification of buyer's funds for the paper ... but that is now agreed and we should be mvoing [sic] forward with the tranching this week ... the other deal (where I am trying to get some funds for Mantara re the 140,000 euros) is also proceeding ... I am working on that in case these other deals stall and Mantara can get you some funds ... not ignoring you at all -- just juggling a million balls on all fronts ... regards ... Dwight.

This email was given by Ojeda to Halata.

On August 20, 2007, Montgomery sent Ojeda another email with the Subject line "updates ..." The email said:

Dear Dominique,

Still have not gotten the signed contract from Thomas ... got an email that I should expect something within the next 12 to 24 hours ... no idea on what the delay is all about, but trying to understand and remain positive ... on a more positive note, my friend in HK has agreed to "loan" 150,000 euros when their deal goes through ... will have them send it to you and will coordinate with you at that time on each month thereafter up to a maximum of 1%, so he is willing to wait for us to get our deal(s) through ... he told me that he is at the MT760 stage, so assuming it goes out this week, the unconditional MT103 should be

[*12] sent by the end of the week ... made it clear to Willie that there is no "walking around" money for him or anyone ... this is only a stopgap favor (this friend also knows Tommasi and is aware of the prior deal) ... let's see what happens in the next 24 hours on both fronts ...

regards ... D.

This email was given to Halata by Ojeda.  As Halata testified:  "[This email] is talking about getting a loan.  And Dominique [Ojeda] had told me that they were offering to loan her the money to pay me back."

On September 11, 2007, Montgomery sent Ojeda and "Willie" the following email:

Dominique and Willie ... as I said, there are two "contracts" that are being processed:

Contract #1:  I am not involved with this contract (i.e., there is NO spread for any of us).  This is the contract where KKP has agreed to loan Mantara money which Mantara will have wired to Dominique in connection with the Hua Sheng deal.  The MT760 under this contract is supposed to be sent this Thursday, September 13, 2007.  Attached is the redacted window letter which I received.  After the MT760 is sent and verified, the buyer sends the MT103 and then the funds are wired.  Assuming it proceeds on Thursday, then KKP should be able to wire the money to Mantara by Tuesday or Wednesday of next week.

Contract #2:  This is the deal where a copy of the contract was sent to Dominique.  IT IS NOT EXPIRED.  Buyer wants to send an MT799 requesting readiness of KKP's bank to receive the conditional MT103.  They have been jerking around with the verbiage and, as you can see, I typed the verbiage for them and sent it to them.  Once the bank agrees, then they will send the MT799, KKP's bank will

[*13] acknowledge, they will send the conditional MT103, KKP will send the MT760, they will release the funds by wire transfer. Below is the email and attachment. Compare the codes in the attachment with the codes you have in the contract. This one might take a week or so to get moving now that they want to first send the MT799.

Joe and I will be happy to meet with you when you come to California. Just let me know when and where. But all I can do now is simply wait for these people to continue with their processing of the deals. Once something is actually moving forward, you will be one of the first to know.

This September 11, 2007 email, which was given by Ojeda to Halata, was connected to a forwarded email from "Dwight Montgomery" to "cywong" dated September 10, 2007. This forwarded email states:

I see you too stay up late ... I took the liberty of drafting sample verbiage for the MT799 to ensure that there are no problems ... it is okay if you reference the Agreement and the codes pursuant to which the conditional MT103-23 will be sent ... it is not okay to reference receiving a BG or the like ... REMEMBER THAT THIS IS THE SETTLEMENT BANK TO ASSIST EVERYONE GETTING

The forwarded "cywong" email appears to be a fragment. The heading of the September 11, 2007 email stated that it was attached to two other documents: "FORM OF MT799 VERBIAGE.doc" and "redacted KKP Update Letter 9-10.pdf". Neither attachment was introduced into evidence.

On December 5, 2007, Ojeda emailed Montgomery:

**[*14]** You either need to send $2000 beginning today every month or send the whole $200k by Friday. I will be at your office or house on Monday.

I have held you in high regard and trusted your word. You need to honor your word and make this right with me today. I will need a call from you today.

On December 5, 2007, Montgomery responded:

Dear Dominique:

I only made two promises to you:

(1) if Mantara or I have a buyer that completes a deal, then you and Willie will be included in the profit distribution; and

(2) if I am included in the profits on a deal that KKP completes, then I will share my profits with you and Willie.

I also informed you that KKP agreed to remit 150K euros if KKP completes a deal.

That is the only "word" I gave to you and Willie, and I will honor that "word" irrespective. I made no other promises to either you or Willie.

I too am very frustrated and angry that not one of the deals has completed. And while I remain confident that a deal will complete, I also remain frustrated and angry at these nonperforming buyers and delays.

All I can do is keep pressing on trying to get a deal done for the three of us. Meanwhile, if you or the FBI come calling, then Joe and I are more than willing to meet with you and I will give all of the emails and other documentation for the FBI to look at. I can not do anything more and do not need to do anything more.

[*15] At the end of the day, all I can and will do is honor the aforementioned promises to you and Willie. That is the only seed I sowed, and I remain optimistic that I -- and you and Willie -- will grow and blossom.

Best Regards,

Dwight.

This email was given to Halata by Ojeda.

As part of Ojeda's attempts to recover the transferred money, she contacted a state prosecutor in California. She also contacted the SEC. Ojeda did not recover the lost money. In the aftermath of the purported bank-guaranty transaction, her relationship with Halata dissolved.

The parties have stipulated that Halata filed an income-tax return for 2007. The return was a Form 1040, U.S. Individual Income Tax Return. On the return Halata did not report a theft loss.

Halata did not file an income-tax return for 2008.

In 2009 the IRS conducted an examination relating to Halata's 2007 and 2008 tax years. Halata hired a tax attorney, John Polk, to represent her before the IRS. Polk's firm assigned a nontax lawyer, Scott Lisman, to investigate Halata's legal remedies regarding the loss of the $181,104. Lisman contacted both Ojeda and Montgomery. Ojeda told Lisman that she had originally thought that the

**[\*16]** purported bank-guaranty transaction was legitimate and felt bad for how things turned out. Montgomery still insisted that the purported bank-guaranty transaction was a legitimate business transaction. He also claimed that he was merely a facilitator of bank-guaranty transactions and that he received no money from them. He said he had no information about how the purported bank-guaranty transaction worked or the identities and roles of the parties to the purported transaction. He said he did not know where Halata's money went. Lisman contacted the SEC and a California state prosecutor. He received no cooperation from them. After his investigation, Lisman reported back to Halata that it would be cost prohibitive for her to file a civil suit against Montgomery. Lisman explained that Montgomery did not have any recoverable assets, that the costs of suing Montgomery would be $30,000-$40,000, and that it was "risky" whether Halata could prove Montgomery received the $181,104.[5]

On December 8, 2009, the IRS issued the notice of deficiency. The tax liabilities calculated in the notice of deficiency did not reflect any deductions related to theft losses. Halata filed a timely petition. The case was tried in Houston, Texas.

---

[5]Lisman also considered the possibility that Halata could sue Ojeda, but informed Halata that such a suit would not result in recovery of the money.

**[*17]**                                       OPINION

1.      Positions of the parties

Halata's petition claimed that she is entitled to a theft-loss deduction "in 2007 and 2008" related to the purported bank-guaranty transaction.

Halata's pretrial memorandum asserted that she is "entitled to claim net operating loss deductions arising from a theft loss she suffered, and which offset her income for 2007 and 2008."

In her closing argument Halata contended that she discovered that she had lost the $181,104 on account of theft in 2007, that she had no reasonable prospect of recovering the $181,104 that year, and therefore that there was a theft-loss deduction of $181,104 for 2007.

In her posttrial brief, however, Halata contended that the theft loss was sustained (1) in 2008, which, according to her brief, was the year she realized that the purported bank-guaranty transaction was a fraudulent scheme, or "alternatively" (2) in 2009, when Lisman advised her that it was too costly to take legal action against Montgomery. She also contended that her "net operating losses resulting from her theft loss can be carried back and applied in 2007 and 2008 under section 172(b)(1)(F) of the Internal Revenue Code." The posttrial

**[*18]** brief was the first time that Halata plainly asserted that a net-operating loss should be carried back from 2009.

The IRS contended that no theft occurred because Halata did not prove that any person appropriated the $181,104 with the intent to deprive her of the money using deception. The IRS asserted that Halata's payment of the $181,104 was "part of a bona fide transaction" and that "this was just a bad investment or the funds are still available to the petitioner." The IRS pointed out that there is no evidence that Lisman attempted to contact European Investors Inc. or Mantara Holdings to verify that the transaction was fraudulent. It also pointed out that there is no evidence that criminal charges were filed against Montgomery.

The IRS claimed that a theft-loss deduction is barred for either the 2008 or 2009 tax year because Halata contended in closing argument that the theft-loss deduction should be allowed for the 2007 tax year.

Furthermore, the IRS contended that Halata has failed to demonstrate that there was no reasonable prospect of recovering the $181,104 in 2007, 2008, or 2009.

The IRS also claimed that Halata is barred from claiming a net-operating-loss carryback from 2009. The IRS reasons as follows:

**[\*19]** [T]he petitioner's claim of a net operating loss carryback from the taxable year 2009 is a new issue not raised in the petition filed in this case, or in the petitioner's pretrial memorandum, or during the trial in this case. Additionally, the petitioner had not amended her petition in this case to properly raise the issue of a carryback from the taxable year 2009. Respondent has not had an opportunity to examine the petitioner's individual income tax return for the taxable year 2009. Therefore, petitioner's attempt to raise the claim that there exists a carryback from the taxable year 2009 to the taxable years in issue in this case is a new issue the untimely raising of which constitutes a surprise, and would be unfairly prejudicial to the respondent, and consequently should not be considered by the Court. See Mwangachuchu v. Commissioner, T.C. Memo. 2012-86.

2.      The theft-loss deduction

Section 165(a) permits a deduction against ordinary income for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." For individuals, the deduction is limited to: (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit though not connected to a trade or business; or (3) losses of property not connected with a trade or business or a transaction entered into for profit if such losses arise from "fire, storm, shipwreck, or other casualty, or from theft." See sec. 165(c). The deduction is allowed for the year the loss is sustained. Sec. 165(a). Generally, a theft loss is treated as sustained during the taxable year in which the taxpayer discovers it. Sec. 165(a), (e). However, even after a theft loss is discovered, if a claim for reimbursement exists during the year of the loss with

[*20] respect to which there is a reasonable prospect of recovery, then a theft loss is treated as "sustained" only when it can be ascertained with reasonable certainty whether such reimbursement for the loss will be obtained. Jeppsen v. Commissioner, 128 F.3d 1410, 1414 (10th Cir. 1997), aff'g T.C. Memo. 1995-342; 26 C.F.R. secs. 1.165-1(d)(2)(i), (3), 1.165-8(a)(2) (2012). Stated differently, a reasonable prospect of recovery will postpone the theft-loss deduction until such time as the prospect no longer exists. Halata has the burden of proving she has sustained a theft loss. See Tax Ct. R. Pract. & Proc. 142(a).[6]

The term "theft" under section 165 is a word of general and broad meaning that includes any criminal appropriation of another's property, including theft by swindling, false pretenses, and other forms of guile. Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956); 26 C.F.R. sec. 1.165-8(d) (2012). Whether a theft loss has been established depends upon the law of the state where the alleged theft occurred. Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), aff'g 61 T.C. 354 (1973); Luman v. Commissioner, 79 T.C. 846, 860 (1982); Paine v. Commissioner, 63 T.C. 736, 740 (1975), aff'd without published opinion, 523

---

[6]The burden of proof shifts to the IRS if the taxpayer is an individual who introduces credible evidence with respect to any factual issue relevant to federal income-tax liability and complied with the substantiation and recordkeeping requirements of the Internal Revenue Code. See sec. 7491(a)(2)(A) and (B). Halata does not assert that the IRS bears the burden of proof.

[*21] F.2d 1053 (5th Cir. 1975).  A taxpayer must prove a theft occurred under applicable state law by only a preponderance of the evidence and not beyond a reasonable doubt.  See Allen v. Commissioner, 16 T.C. 163, 166 (1951) ("If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail.  If the contrary be true and reasonable inferences point to another conclusion, the proponent must fail.").  A criminal conviction is not necessary in order for a taxpayer to demonstrate a theft loss.  See Monteleone v. Commissioner, 34 T.C. 688, 694 (1960).

     a.     Halata sustained a loss attributable to a theft.

Halata resided in Texas when the purported transaction occurred.  Therefore, we will decide whether the evidence presented allows for us to determine that a theft occurred under Texas law.

Theft is prohibited by Tex. Penal Code Ann. sec. 31.03(a) (West 2011 & Supp. 2012):

> THEFT.  (a)  A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.

Tex. Penal Code Ann. sec. 31.03(b) provides that "[a]ppropriation of property is unlawful if:  (1) it is without the owner's effective consent".  Tex. Penal Code

**[\*22]** Ann. sec. 31.01(3) provides that consent is not effective if it is induced by deception.

Under Texas law, a theft of Halata's $181,104 took place if someone appropriated the money by deceiving Halata and intended to deprive Halata of the money. Id. In evaluating whether there was a theft, we must resolve a predicate factual dispute between the parties regarding the nature of the purported bank-guaranty transaction. Halata contends that the transaction was fictitious; the IRS contends it was not fictitious. The question of whether the transaction was fictitious is relevant to whether Halata's money was "appropriated", whether there was a deception, and whether someone intended to deprive Halata of her money.

The IRS posits several alternative ways to reach the conclusion that the purported bank-guaranty transaction was not fictitious. It states:

> From respondent's [the IRS's] view based on the record this could be one of several possible transactions. First, the petitioner [Halata] could have been investing in a heretofore undeterminable credit investment in Europe based on negotiations between her friend Dominique Ojeda and Dwight Montgomery. Second, the petitioner may have loaned money to Ojeda to invest in the undeterminable credit investment in Europe and would be paid back by monies received by Ojeda. Third, the petitioner may have transferred money to an investment account in Europe and the money may, or may not be there. There is no way to determine what occurred from the record.

[*23] We take each possibility in turn. We do not think that the $181,104 wire transfer was a "credit investment in Europe". First, there were the documents that Montgomery gave Ojeda that supposedly memorialize the transaction. These documents--the October 13, 2006 "invoice" from "European Investors Inc." and the December 5, 2006 "Irrevocable Master Payment Instructions"--look phony to us. Second, there were the supposed terms of the transaction. A $2.5 million return on $181,104 is too good to be true; a purported return that high is an indicator of a fraudulent scheme.

We also reject the possibility that the $181,104 was a loan from Halata to Ojeda. It appears to us that Ojeda did not agree to repay Halata out of her personal funds in the event of the loss of the $181,104. Rather, Halata bore 100% of the risk of loss from the purported transaction. We therefore do not agree that the transfer of $181,104 was a loan from Halata to Ojeda.

We also do not agree that Halata has an ownership interest in an "investment account in Europe". Halata transferred money to a mysterious Swiss bank account. She received no contract documents in exchange evidencing her legal rights. This is more consistent with a scam than with an investment account of some kind.

[*24] Having determined that the purported bank-guaranty transaction was fictitious, we find that the evidence is consistent with the proposition that there was a theft of Halata's $181,104. First, Halata's money was "appropriate[d]" by someone. It was transferred to someone's Swiss bank account in exchange for nothing of value. Second, it is apparent from the evidence described above that Halata was deceived by someone into transferring the money. That makes the appropriation unlawful. Third, someone intended to deprive Halata of the money. That is the only plausible explanation that is consistent with the phony documents. As the IRS points out, however, the evidence does not definitively resolve the identity of the person who (1) appropriated Halata's money, (2) deceived Halata, and (3) intended to deprive Halata of her money. In other words, the evidence does not definitively resolve the identity of the thief.

If we had to determine the identity of the thief, we would name Montgomery. Much of the evidence supports the proposition that Montgomery intended to deprive Halata of her money. Montgomery claimed that he was the central point of contact among multiple parties: a "buyer", a "provider", a "settlement bank", ABN Amro, Credit Suisse, and "Mantara Holding". These parties either were nonexistent or were not involved in any bank-guaranty transaction with Montgomery. His assertions that he was the central point of

[*25] contact among parties that did not actually exist or that had nothing to do with his transaction indicate that he intended to deprive Halata of money (through Ojeda). An additional indication of Montgomery's knavery is that he told Lisman that the bank-guaranty transaction was a legitimate transaction. By the time of Lisman's investigation, Montgomery would have known that the transaction was not legitimate. His claim otherwise is suspect. The major stumbling block to the conclusion that Montgomery was the thief is the lack of direct evidence that he received the $181,104. Even without direct evidence, it is reasonable to surmise (and we do find) that: (1) Montgomery would not have orchestrated the fraud unless he thought he would ultimately receive the wire transfer and (2) he did actually receive the $181,104 wire transfer. In the alternative, even if Montgomery was merely an unwitting facilitator of the purported bank-guaranty transaction and therefore had no intent to deceive Halata, and even if he did not receive the $181,104 wire transfer and therefore did not appropriate Halata's money, Halata still suffered a theft at the hands of whoever orchestrated the scheme. See Jensen v. Commissioner, T.C. Memo. 1993-393 (the taxpayers were entitled to a theft-loss deduction even though they had contact only with their insurance broker, who invested their money in a Ponzi scheme, and who was not

**[*26]** alleged to have been part of the scheme), aff'd without published opinion, 72 F.3d 135 (9th Cir. 1995).

We conclude that her $181,104 was lost on account of theft. Therefore, Halata is entitled to a theft-loss deduction.

b.      Halata's theft loss was sustained in 2009.

Generally a theft loss is considered sustained in the year in which the taxpayer discovers it. Sec. 165(a), (e). Thus, we must determine the year in which Halata discovered the loss. Halata convincingly testified that on or before December 5, 2007, she realized that she had been scammed. We therefore conclude that 2007 was the year that Halata discovered the theft.

The theft loss is not considered to be sustained in 2007 if Halata had a claim for reimbursement with respect to which there was a reasonable prospect of recovery. See 26 C.F.R. sec. 1.165-1(d)(2)(i) (2012). In 2007, Halata had a respectable legal claim against Montgomery. Montgomery passed on deceptive information to Ojeda, thus inducing Halata to transfer the money. Halata did not know then that Montgomery had no assets from which she could recover. Therefore we conclude that in 2007 Halata had a claim for reimbursement with respect to which there was a reasonable prospect of recovery.

**[\*27]** If in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, a theft loss is considered to have been "sustained" only when "it can be ascertained with reasonable certainty whether or not such reimbursement [for the loss] will be received." 26 C.F.R. sec. 1.165-1(d)(2)(i) (2012); see also 26 C.F.R. secs. 1.165-1(d)(3), 1.165-8(a)(2) (2012). Thus, we must determine the year in which it could be ascertained with reasonable certainty that reimbursement for the $181,104 loss would not be obtained.

During 2007, Ojeda conducted her own investigation of the purported bank-guaranty transaction on behalf of Halata. She contacted the authorities about Montgomery. She demanded reimbursement from him. We conclude that these efforts did not produce reasonable certainty as to whether Halata could obtain reimbursement from Montgomery. Ojeda was not a lawyer. She could not initiate civil litigation against Montgomery on Halata's behalf nor was she trained to evaluate whether litigation was a reasonable method of collecting money from Montgomery. Ojeda likely feared that she could end up a potential defendant herself; this fear would have impaired her ability to objectively evaluate Halata's rights against Montgomery. By contrast, Lisman's 2009 investigation appropriately evaluated the advisability of filing suit against Montgomery.

**[\*28]** Lisman determined that a lawsuit was impractical given the cost of the lawsuit, Montgomery's lack of recoverable assets, and Montgomery's possible defenses.

The IRS faults Lisman for his apparent failure to contact "European Investors Inc." and "Mantara Holding" to investigate the recovery of Halata's money. However, these entities were either (1) fictitious or front entities or (2) actual entities that were uninvolved in any transaction involving Montgomery. Efforts to pursue these entities would have been futile. We conclude that Lisman's investigation was sufficient to determine with reasonable certainty that Halata could not obtain reimbursement for her $181,104 loss. Lisman's investigation was conducted in 2009. Therefore, Halata's theft loss was sustained in 2009.[7]

3.  The effect of the theft-loss deduction for 2009 on Halata's tax liabilities for 2007 and 2008

The next issue to resolve is whether Halata's theft loss in 2009 creates a net-operating loss for 2009 that should be carried back and deducted against her 2007 or 2008 income. The difference between gross income and deductions is a net-operating loss. See sec. 172(c). A net-operating loss for 2009 exists if Halata's

---

[7]It appears that there is still time for Halata to file an amended return for tax year 2009 claiming a theft-loss deduction. See sec. 6511(a).

**[\*29]** deductions for 2009, including the theft-loss deduction, exceed her gross income for 2009. The general rule for carrying back net-operating losses is that a net-operating loss is first deducted from income in the tax year that is two years before the year of the net-operating loss. See sec. 172(b)(1)(A)(i).[8] The year of the net-operating loss that would result from Halata's theft loss is 2009, and, therefore, under the general rule, the first year of the carryback period would be 2007. The year 2007 is before us jurisdictionally. The problem is that Halata never filed a pleading asserting her theory that there was a net-operating loss for 2009 that should be carried back to prior years. See Tax Ct. R. Pract. & Proc. 34(b)(4) (petition is required to "assign[]", i.e., state, every error alleged to have been made by the IRS in the determination of the deficiency). The Court and the IRS were not advised of her theory until after trial. See Tax Ct. R. Pract. & Proc. 31(a) (purpose of pleadings is to give parties and Court fair notice of matters in controversy). Therefore she is barred from asserting it. See Tax Ct. R. Pract. &

_____

[8]One or more special rules affecting the carryback period apply to the portion of any 2009 net-operating loss attributable to Halata's theft-loss deduction. See sec. 172(b)(1)(F) (three years before the year of loss is the first year of the carryback period for the portion of the net-operating loss that is an "eligible loss", including a theft loss); sec. 172(b)(1)(H) (allowing a taxpayer to elect whether the first carryback year is three, four, or five years before the year of net-operating loss if the year of loss is 2008 or 2009). We need not determine the length of the carryback period because, as we explain, Halata failed to assert in her petition that any 2009 net-operating loss should be carried back to any prior year.

**[\*30]** Proc. 34(b)(4) (any issue not raised in assignments of error in petition is deemed conceded). Also, Halata would have had the burden of proof regarding the net-operating loss. She adduced no evidence regarding her gross income for 2009 and her deductions for 2009 (other than the $181,104 theft-loss deduction). Without this information, her net-operating loss cannot be calculated.[9] She would not have met her burden of proof. See Paulson v. Commissioner, T.C. Memo. 1991-508, 62 T.C.M. (CCH) 968, 974 (1991).

4.      Conclusion

In summary, Halata was the victim of a theft and she sustained a $181,104 theft loss in the taxable year 2009. However, she has not properly raised the issue that the theft loss should affect her taxable income for 2007 and 2008 by virtue of/via a net-operating loss carryback from 2009 and in any event has not substantiated any such net-operating loss carryback. Her deficiencies for these two years are therefore unaffected by the theft loss.

To reflect the foregoing and concessions,

Decision will be entered

under Rule 155.

---

[9]Alternatively, if Halata were entitled to carry back "eligible loss[es]" from 2009, see sec. 172(b)(1)(F), such eligible losses cannot be calculated either.